**GLYFADA SEAFARING CORPORATION,**
**Plaintiff,**

v.

**FILLMORE SHIPPING LIMITED and Schiavone Chase Corporation, Defendant and Third–Party Plaintiffs,**

v.

**Joseph E. ROYCE and Lawrence Blatte, Third–Party Defendants.**

**No. 87 CIV 1424 (LBS).**

United States District Court, S.D. New York.

July 29, 1987.

As Amended Aug. 13, 1987.

Kelly, Roth & Hazen, New York City, for defendant Schiavone Chase Corp.; William H. Roth, of counsel.

## OPINION

SAND, District Judge.

This is an action by Glyfada Seafaring Corporation to confirm an arbitration award rendered in London against Fillmore Shipping Limited and to enforce a guarantee by Schiavone Chase Corporation of Fillmore's obligation under a charter agreement with Glyfada. The action, which has been tried to the Court, presents three issues: (1) whether the Secretary and Treasurer of the defendant Schiavone, Stephen H. Chase, who executed the guarantee of Fillmore's obligations under the charter agreement, had actual authority to execute the guarantee or had apparent authority upon which the plaintiff reasonably relied, (2) if the guarantee is enforceable, what is the appropriate measure of damages, (3) is the plaintiff entitled to the recovery of sanctions pursuant to Federal Rule of Civil Procedure 11. We address these issues seriatim and this Opinion constitutes our findings of fact and conclusions of law.

The defendant Schiavone Chase Corporation is a New York corporation whose stock was owned in equal shares by Myron Chase (who recently passed away), father of Stephen H. Chase, the Secretary and Treasurer of the corporation, and by Donjon Marine, Inc., a corporate entity through which John A. Witte conducted certain business activities. Myron Chase was president of the corporation and John A. Witte was chairman of the board. Schiavone Chase engaged in the purchase and sale of scrap metal. It would from time to time charter vessels to sell steel scrap and would engage in some 20–25 transactions per year. It had a handful of employees.

Myron Chase and John Witte were also participants in a joint venture with one Lawrence Blatte and Joseph Royce, each of whom had a twenty-five percent interest in the joint venture. The activities of the joint venture involved the chartering of vessels and related activities.

Chalos, English & Brown, New York City, for plaintiff; Michael G. Chalos, Peter Skoufalos, of counsel.

On or about March 28, 1984, the joint venture operating under the name Fillmore Shipping Limited, through its London broker entered into negotiations for the purpose of chartering the vessel, M/V Sonid, which vessel is owned by the plaintiff, Glyfada, a Liberian corporation, with an office and place of business in Greece. Plaintiff Glyfada had instructed its broker not to charter the vessel, Sonid, to any entity of unknown responsibility without securing a guarantee from a "first class company" (Walker deposition, pages 43 and 44; Parliaros deposition, pages 15 and 16). On April 2, 1984, the broker for the plaintiff provided to Fillmore's broker, by telex, the text of the guarantee that would be acceptable to Glyfada. On April 6, 1984, Fillmore's broker telexed Glyfada's broker that "Sonid Schiavone Chase Corp. agreed to the telex of guarantee wording as per your telex ED 2/4/84 timed 17:14 hrs." The telex continues, "however, the Schiavone Chase state view that they now to all intents and purposes will be the actual charterers with full responsibility, they will nominate for charter party purposes: Fillmore Shipping Limited, Monrovia, Liberia." Pursuant to this exchange of telex and the previous negotiations, the fixture was concluded for the M/V Sonid on April 6, 1984.

On April 14, 1984, Royce, one of the joint venturers identified by Stephen Chase as someone closely associated with Witte, sent a telex to Schiavone Chase for the attention of "Myron–Steve". The only "Myron" employed at the offices of Schiavone Chase was Myron Chase. The telex, referring to the terms of the M/V Sonid fixture, stated "Charterers (sic) to be guaranteed by Schiavone Chase as per owners P & I Club standard letter wording already given." On or about May 24, 1984 an original letter of guarantee dated April 6, 1984, on the Schiavone Chase corporate letterhead, signed by Stephen H. Chase, as treasurer of Schiavone Chase, was delivered to the broker. The letter of guarantee states in relevant part:

"The Schiavone Chase Corporation of New York hereby unconditionally guarantee the full and complete performance by Messrs. Fillmore Shipping Ltd., of Monrovia, Liberia, and all their obligations under the terms and conditions of the above charter party dated April 6, 1984."

Stephen H. Chase who executed the letter, is a 1974 graduate of the Columbia Law School, who practiced law for eight years including one year with an admiralty personal injury law firm. Arnold Witte, the Chairman of Schiavone Chase, is also a licensed attorney. Stephen Chase testified that at the time he signed the guarantee letter, he believed he was acting as an authorized officer of the corporation. Indeed, evidence at the trial indicates a pattern of execution by Stephen Chase of various corporate commitments, including guarantees, prior to his execution of this guarantee. There was no directors' or shareholders' meeting explicitly authorizing the execution of the guarantee. Stephen Chase testified that he prepared and signed the guarantee in response to a telex which he received from Royce, which began "Clearing up desk of paperwork—require the following letters of guarantee on S. Chase letterhead:". The telex proceeds to describe three letters of guarantee, the third of which was to be the guarantee for the Sonid dated April 6, 1984. The telex concludes "That's it on the paperwork—PLS send same in mail tomorrow if possible."

On November 19, 1984, some seven months after the execution of the guarantee, the four principals in the Fillmore joint venture executed a document memorializing an agreement under which they had been operating for some time. After reciting the respective interests of the parties and the purpose of the joint venture, the agreement states:

"In accordance with the venture activities, Myron L. Chase and John Arnold Witte have contributed cash and credit and guaranteed certain charter payments and bunker payments.... In addition, Witte Chase Corporation [a name by which the defendant Schiavone Chase Corporation is now known] has guaranteed or will guarantee hires or bunkers. To that extent, Joseph Royce and Law-

rence Blatte will indemnify Witte Chase Corporation against liabilities on these guarantees 25% by Joseph Royce and 25% by Lawrence Blatte." (Plaintiff's Exhibit 26).

On January 25, 1985, the defendant Schiavone Chase issued its own check to Boston Fuel Transportation, Inc. in the amount of $69,932.82 in payment of bunkers for the M/V Sonid. It was later reimbursed for this payment.

A dispute arose between the plaintiff as owner of the Sonid and Fillmore as charterer thereof and Glyfada, through its broker, telexed Schiavone Chase, advising of Glyfada's claim and the fact that the owners would be looking to Schiavone Chase pursuant to its guarantee. These telexes were received on a Schiavone telex machine and after consulting with attorneys, Stephen Chase, on behalf of Schiavone Chase, advised the brokers that "We need some time to look into this matter but we assure you that we intend to perform all of our legal obligations under the terms of our guarantee".

The dispute between Glyfada and Fillmore resulted in arbitration in London pursuant to the terms of the charter party. After an evidentiary hearing, the arbitrators made a final award granting Glyfada recovery against Fillmore in the amount of $57,577.38, plus interest at the rate of 10% from April 1, 1985 until the date of the final award in the amount of $9,559.41.

### Conclusions

Defendant takes the position that Schiavone Chase and Fillmore were two unrelated entities and that a Secretary/Treasurer of a New York corporation is not authorized to execute a guarantee of the obligations of an unrelated entity in a matter not in the ordinary course of business absent explicit authorization by the shareholders or directors. Although one may not quarrel with the statement of abstract corporate law, it bears little or no relationship to the facts in this case. In reality what occurred here is that four individuals, Myron Chase, John Witte, Lawrence Blatte, and Joseph Royce, engaged in a number of activities in connection with a purchase sale and shipment of scrap metal. In regard to those activities in which only Witte and Chase were involved, Schiavone Chase was the vehicle utilized. With respect to those activities in which all four were involved, Fillmore was utilized. The fact that Schiavone Chase acted with the usual informality of closely held corporations does not furnish a basis for it to escape from its commitments. We are not here dealing with a large corporate entity in which the various participants function in separate spheres, unbeknownst to each other. Here, certainly, the documentation and description of the activities of Schiavone Chase fully support the inference that Myron Chase and John Witte were fully apprised of the activities with respect to Fillmore and these two parties constituted or represented all of the stockholders of the corporation. We hold that when Stephen Chase executed the guarantee of April 6, he was in fact authorized to do so. We further hold that, even if he were not actually authorized, Stephen Chase had the apparent authority to execute the guarantee on which apparent authority plaintiff reasonably relied. In any event, the subsequent actions and acknowledgements of Schiavone Chase, including the telex sent after the dispute arose, and the recital of the guarantee in the joint venture agreement constitute an adoption and ratification. In sum, we hold that the guarantee is fully enforceable.

### Damages

Plaintiff has submitted as its claim for damages the following:

$57,577.38 — Principal amount of Arbitrator's Award dated Nov. 28, 1986.

9,559.41 — Ten (10%) percent interest awarded by Arbitrators from April 1, 1984 to Nov. 16, 1986.

2,224.80 — Arbitrators' Costs (Pounds Sterling 1,545 at exchange rate of L1 = $1.44).

6,719.63 — Arbitration taxable costs, including reasonable attorneys' fees. (Pounds Sterling 4,479.75 at exchange rate of L1 = $1.50).

$76,081.22 Sub-Total.

4,279.56 — Interest at rate of nine (9%) percent from 11/28/86 to 7/15/87.

$80,360.78 TOTAL

■ Defendant contests its liability for all of the aforesaid but has furnished us with no grounds why all of these items do not come within the scope of an unconditional guaranty of "all of their obligations under the terms and conditions of the above Charter Party dated April 6, 1984" (Exhibit 2). These obligations included the payment of the sums due under the charter as found by the arbitration, as well as the costs of the arbitration.

We award damages in the amount of $80,360.78 plus interest to date.

### Rule 11 Sanctions

■ Following the initiation of this litigation to enforce the arbitration award, plaintiff Glyfada moved for summary judgment. At the argument on summary judgment, counsel for Schiavone Chase took the position that the guarantee was unenforceable because Stephen Chase lacked actual authority to execute a guarantee which was for an unrelated entity, was not entered in the ordinary course of business, and was executed a significant period of time after the charter between the plaintiff and Fillmore had already been fixed. Based on these representations, the Court denied the motion for summary judgment and set the matter down for an early trial. At the time of this ruling, plaintiff gave notice of its intent to seek Rule 11 sanctions urging that the defenses asserted to the guarantee were frivolous.

Plaintiff seeks $19,374.00 for legal fees, and disbursements of $2,149.23. Plaintiff claims that defendant needlessly and without sound basis compelled it to expend over $20,000 to collect a debt which it should have acknowledged of approximately $80,000.

We conclude that Rule 11 sanctions are appropriate here for the following reasons. First, the commercial context in which this dispute arises has some significance. The shipping industry relies extensively on the use of brokers, telexes, guarantees and the reasonable assumption that the parties can act without undue formality with reliance on good faith and ordinary commercial understandings. Second, on the merits, now that all the facts are before the Court, it is apparent that the representations that were made at the time of the summary judgment argument have not been borne out by the evidence. What has doubtless occurred here is a falling-out among the parties to the joint venture with respect to the indemnification contained in the joint venture agreement. But it is unconscionable for the parties to impose upon the plaintiff the costs and burdens of their inter se controversy. Further, of necessity, the cost of pursuing this claim in this litigation has been disproportionate to the amount involved through no fault of plaintiff's counsel.

Although we conclude therefore that Rule 11 sanctions are appropriate, we find it less easy to discern the point at which it became impermissible for defendants' counsel to continue defending this action. Nor is it clear to us to what extent the burden of such Rule 11 sanctions should rest with the defendants as distinguished from counsel.

We ask that both sides submit further affidavits within twenty (20) days of the date hereof setting forth at which stage in the proceedings defendant's counsel knew or should have been aware of the existence of the documentation to which the Court has alluded including especially the exhibits 17 and 26. Counsel for the defendant should also set forth their views as to allocation of the cost and sanctions as between the defendant and counsel. For example, in his affidavit in opposition to the imposition of sanctions, William Roth, Esq. on behalf of the defendant, states that the cost of preparing the complaint (nearly $3,000) was incurred prior to his signing of any pleading in this motion. If in fact defendant's counsel was not involved in this stage of the controversy, such cost would not be attributable to counsel, but might well be appropriately assessed against the client.

■ Mr. Roth similarly challenges the right of the plaintiff to recover the cost of preparing the motion for summary judgment (nearly $7,000) because he is of the

opinion that sanctions cannot be imposed upon the prevailing party. True, the defendant prevailed at the motion for summary judgment. However, if the defendant prevailed on the motion for summary judgment, because it misrepresented the relationship between the parties and the effective date of the guarantee, it can hardly rely on the outcome of that motion as grounds for defeating an application for costs.

Supplemental affidavits requested by the Court shall be furnished within twenty (20) days from the date hereof.

SO ORDERED.